**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>       Plaintiff,<br><br>v.<br><br>MOBILE BILLBOARDS OF AMERICA, INC., INTERNATIONAL PAYPHONE COMPANY, RESERVE GUARANTY TRUST, MICHAEL A. LOMAS and MICHAEL L. YOUNG,<br><br>      Defendants. | CIVIL ACTION NO.<br><br>1:04-CV-2763-WBH |

**RECEIVER'S MOTION FOR CONTEMPT SANCTIONS AND FOR
INJUNCTIVE RELIEF ENJOINING PROSECUTION
OF NORTH CAROLINA CIVIL ACTION**

S. Gregory Hays, Receiver (the "Receiver") files this Motion seeking contempt sanctions and an order that, until such time as this Receivership is concluded, enjoins the prosecution of a civil action filed in North Carolina that is interfering with the Receiver's ability to administer the Receiver Estate. More importantly, it appears that the subject civil action has been initiated and funded by a sales agent who continues to mislead investors who purchased MBA billboard investments from and through him. In support of this Motion, the Receiver shows this Court as follows:

1.      As more fully described in the Receiver's First Interim Report filed on or about December 1, 2004, the investment offering that is the subject of this SEC enforcement action operated as a Ponzi scheme.  In sum, investors purportedly purchased mobile billboards from Mobile Billboards of America, Inc. ("MBA") and then leased the billboard to International Payphone Company d/b/a Outdoor Media Industries ("IPC").  The lease payments equated to a 13.49% return on the investment (i.e., the purchase price), with investors being given an option to "sell" the billboard(s) back to IPC for the amount of the original purchase price.  In truth, lease payments were funded, not from the operation of billboards, but from purchase money paid by later investors.

2.      In selling these bogus investments, MBA utilized a network of sales agents.

3.      Scott B. Hollenbeck, a sales agent who resides in Kernersville, North Carolina, sold in excess of $11 million in MBA billboard investments, earning approximately $3.2 million in commissions.  Hollenbeck sold more billboard investments than any other individual MBA sales agent.

4.      On or about December 8, 2004, Hollenbeck gave deposition testimony in this case, a copy of which will be filed in connection with this Motion.  Many of

the factual allegations set forth herein are based upon Hollenbeck's deposition testimony.[1]

5.      It appears that Hollenbeck sold billboard investments to more than 100 different individuals (referred to herein as "Hollenbeck's investors").  Many of Hollenbeck's investors are members of his church.

6.      As more fully set forth below, Hollenbeck has perpetrated a fraud and engaged in other unlawful conduct that began prior to the sale of the subject MBA investments and continues through today.

7.      Among other things, without fully informing his investors, Hollenbeck has initiated and is funding a civil action filed in the United States District Court for the Middle District of North Carolina and has included most, if not all, of his investors as named plaintiffs.  That civil action is referred to herein as the North Carolina Action.  Copies of the Complaint and Amended Complaint filed in the North Carolina Action are attached hereto as Exhibits "A" and "B," respectively.

8.      Upon information and belief, some or all of Hollenbeck's investors are unaware that the North Carolina Action has been filed and/or that they are named as plaintiffs in that action.

_____

[1] Citations to Mr. Hollenbeck's deposition transcript are reflected as "(SBH: [page number],[line numbers])."

9.     The defendants in the North Carolina Action are:

- Michael Lomas – defendant in this action

- Michael Young – defendant in this action

- Laurinda Holohan – former director, officer and employee of MBA

- Barry C. Maloney – former attorney for MBA

- Maloney & Knox – Barry Maloney's law firm

- Heiser & Jesko, Inc. – MBA's auditors

The Receiver is currently investigating each of these individuals and entities and their involvement in the MBA offering.  If the Receiver determines that valid claims exist against some or all of these individuals, he will prosecute or compromise those claims, with all recoveries becoming assets of the Receiver Estate.

10.     Hollenbeck has been selling insurance, investments and other financial products since 1989.  Approximately 75% of the individuals who purchased MBA investments from Hollenbeck had purchased other financial products from him.  (SBH, p. 123, l. 24 – p. 124, l. 22.)

11.     In or about 2000, Hollenbeck sold payphone investments on behalf of a company known as Phoenix Telecom, Inc.  The Phoenix payphones were "fixed income products" that were very similar to the MBA billboard investments.  (SBH, p. 78, ll. 7-18.)

12.     Phoenix Telecom and its principals were sued by the SEC in an enforcement action making substantive claims that are virtually identical to the claims asserted in this action.  *See,* <u>SEC v. Phoenix Telecom, et. al.</u>, 1:00-CV-01970-JTC.  Prior to the filing of that action, Phoenix's payphones and lease obligations had been assigned to and assumed by ETS Payphones.  Shortly thereafter, ETS Payphones and its principal were sued by the SEC in yet another enforcement action making similar allegations.  Hollenbeck was aware of these events at or about the time that they were transpiring.  (SBH, p. 73, l. 20 – p. 82, l. 14.)

13.     Despite being aware of the collapse of Phoenix Telecom and ETS, Hollenbeck provided assurances to his investors that their payphone investments were "safe."  As a part of his effort to lull his investors and divert attention away from his role in the sale of bogus payphone investments, Hollenbeck began making payments to his investors, which he led them to believe were lease payments made in accordance with their payphone investment.  In truth, Hollenbeck was making these payments from his own resources.  These payments totaled approximately $30,000 per month.  (SBH, p. 81, l. 23 – p. 83, l. 4; p. 96, l. 14 – p. 97, l. 17.)

14.     In or about September 2000, Hollenbeck began selling a virtually identical payphone product for National Payphone Company ("NPC").  (SBH, p. 89, ll. 12-15.)

5

15.    NPC is the predecessor in interest to MBA and was directed, controlled and managed by Defendants Michael Lomas and Michael Young.

16.    Because Hollenbeck was making payments to his Phoenix payphone investors, NPC provided him with a source of income to continue funding those payments (and, thereby, continuing to lull his investors into believing that their payphone investments were performing in the way that he had represented at the time of the sale). In fact, Hollenbeck described the NPC offering as his "savior" because his commissions provided him with a continuing source of funds to make payments. (SBH, p. 97, ll. 1-17.)

17.    At the time that Hollenbeck began selling NPC payphones, MBA was "in the workings." It was anticipated that the product would ultimately change from payphones to billboards and that NPC payphone investors would be given the option to convert their payphone investment to a billboard investment (which, in fact, happened) (SBH, p. 97, l. 18 – p. 100, l. 25.)

18.    Despite his involvement with Phoenix and ETS, Hollenbeck did no meaningful due diligence regarding the NPC and MBA products, which were virtually identical to products that had been the subject of the prior SEC enforcement actions. Instead, he relied on Jim Gibson, the person who recruited him to become an NPC sales agent. Hollenbeck did no due diligence regarding Gibson. (SBH, p. 92, l. 4 – p. 95, l. 25; p. 109, l. 17 – p. 110, l. 25; p. 111, l. 7 –

p. 112, l. 8.)  In reality, Hollenbeck did nothing beyond talking to Gibson and Michael Lomas to determine whether the information he was being provided was reliable.  (H., 133, ll. 18-25.)

19.     Originally, Hollenbeck's NPC sales commission was approximately 18%, which rose over time to 22% at MBA.  (SBH, p. 101, ll. 1-22; p. 107, l. 10 – p. 108, l. 6.)

20.     Hollenbeck has used his NPC/MBA commissions to continue making payments to his original Phoenix investors.  (SBH, p. 104, ll.4-17.)

21.     The NPC and MBA investments were securities.  However, they were not registered in accordance with the requirements of the federal securities laws or the laws of North Carolina (and other states in which they were sold).  Moreover, Hollenbeck was not registered or licensed to sell securities at the time that he was selling these investments.

22.     In making sales of billboard investments, Hollenbeck provided prospective investors with a Uniform Franchise Offering Circular ("UFOC") and other sales materials prepared by MBA.  Hollenbeck had not read the UFOC until after the SEC filed its case against MBA in late September 2004.  (SBH, p. 112, l. 11 – p. 114, l. 22.)  The UFOC and other sales materials contain numerous misrepresentations of material fact and, in addition, fail to disclose information that would be important to prospective investors.

7

23.     In addition to the fraudulent UFOC and other MBA sales materials, Hollenbeck engaged in independent fraudulent conduct including, but not limited to:

- Failing to disclose to investors that he had been the subject of a disciplinary proceeding and lost his securities license in 2002 or 2003;

- Failing to disclose to investors that the virtually identical Phoenix Telecom payphone investments sold by him had been the subject of an SEC enforcement action;

- Failing to disclose to investors that Phoenix Telecom had been placed in receivership and that ETS Payphones had filed a bankruptcy petition;

- Failing to disclose to investors that the source of continuing "lease payments" purportedly from Phoenix Telecom and/or ETS were actually being made by Hollenbeck from commissions being generated by the sale of NPC payphones and MBA billboards;

- Failing to disclose that a substantial portion of the investment made (i.e., 18% to 22%) was being paid to him in sales commissions (with additional amounts going to the "master agent," who recruited him to sell these investments);

- Misrepresenting to investors that their investment was insured by AIG when, in fact, the purported "Surety Bond" (an exemplary copy of which is attached hereto as Exhibit "C") was fabricated by Hollenbeck using information regarding an insurance policy issued to a securities brokerage firm for whom Hollenbeck had previously worked. (SBH, p. 157, l. 12 – p. 161, l. 6.)

24.   On September 21, 2004, the SEC filed this action and the Receiver was appointed. In part, the order appointing the Receiver provides:

> All creditors and other persons seeking money damages
> or other relief from the Receiver Estate and all others
> acting on behalf of any such creditors and other persons
> . . . *are restrained from doing anything to interfere with*
> the possession, *recovery* or management by the Receiver
> of the property and assets owned, controlled, belonging
> to, or in the possession of the Receiver Estate, *or to*
> *interfere with the receiver in any manner during the*
> *pendency of this proceeding*. (§ XXI, Receivership
> Order dated September 21, 2004. Emphasis added.)

25.   The Receiver first communicated directly with investors in a letter dated October 18, 2004. Among other things, the Receiver asked investors to provide him with information regarding their investment.

26.   Shortly thereafter, the Receiver's office received telephone calls from one or more individuals, who were unwilling to provide their names, but identified themselves as having purchased MBA investments from Hollenbeck. These callers indicated that Hollenbeck was telling his investors that their MBA investments

were safe and that they should not deal directly with the Receiver or provide him with the information requested in the letter.

27.    In or about October 2004, Hollenbeck's attorneys contacted the SEC and the Receiver's counsel and indicated that they intended to file the North Carolina Action.  At the time, neither the Receiver nor his counsel was aware of the full nature and extent of Hollenbeck's conduct.  Even so, the Receiver's counsel expressed reservations about the wisdom of filing the North Carolina Action because the Receiver was in the process of investigating the conduct of all involved in the MBA offering and would be asserting claims against those who were responsible.  In addition, Receiver's counsel raised questions about inherent conflicts of interest between Hollenbeck and his investors and indicated that if the goal was to assist investors, claims should be asserted against the sales agents, including Hollenbeck.

28.    Despite the admonitions and reservations expressed by Receiver's counsel, the North Carolina Action was filed.  As the attached Complaint and Amended Complaint (Exhibits "A" and "B") make clear, they are essentially copies of the SEC's complaint filed in this case.

29.    Since the filing of the North Carolina Action, Hollenbeck has provided deposition testimony and the Receiver's investigation has continued.  In addition to the facts set forth above, the Receiver has become aware of

Hollenbeck's conduct since the filing of this action (and resulting collapse of MBA).

30.     No lease payments have been made by MBA, IPC or the Receiver to any investor since September 21, 2004.  However, consistent with his prior conduct, rather than confirming the collapse of MBA and the loss of their entire investment, Hollenbeck has been funding monthly payments to his investors in the amount of $95, 218 per month.  (SBH, p. 150, l. 25 – p. 151, l. 6.)  The source of those funds is currently unknown to the Receiver, but it is clear that they are not related to or derived from MBA or the operation of billboards.

31.     The Receiver has been provided with a copy of a letter sent by Hollenbeck to some or all of investors indicating that their "accounts" had been moved to an entity under his direction and control and that monthly payments would continue.  A copy of the letter is attached hereto as Exhibit "D."  Obviously, this letter creates the false impression that his investors' MBA investment is safe and continuing to perform.

32.     Hollenbeck is paying the legal fees in the North Carolina Action, which include a $100,000 initial payment, with an obligation to pay up to $225,000 depending upon time involved.  (SBH, p. 149, l. 22 – p. 150, l. 7.)  In sum, this is wasted money.  Nothing can be accomplished in the North Carolina Action that will not otherwise be accomplished as a part of the Receivership.

33.     The combined effect of Hollenbeck's conduct is to interfere with the Receiver's administration of the Receiver Estate and to mislead and lull his investors into believing that their MBA investments are safe and secure.

34.     The Receiver, through his counsel, has requested that Hollenbeck and his counsel stay the North Carolina Action pending the conclusion of this receivership.  Those requests have been rejected.  Copies of correspondence between the Receiver's counsel and Hollenbeck's counsel in the North Carolina Action are attached hereto as Exhibits "E" to "G."  Because of the refusal of Hollenbeck and his counsel to comply with the Receiver's request, the Receiver has been forced to spend time and money filing this Motion.

35.     The North Carolina Action also interferes with the Receiver's ability to administer the Receiver Estate by creating the possibility of disparate and conflicting results by and among investors.  Information currently available to the Receiver indicates that there are approximately 983 investors in MBA.  Among other things, the Receiver is responsible for developing a fair and equitable plan of distribution of any assets of the Receiver Estate.  To the extent that the defendants in the North Carolina Action engaged in unlawful conduct that resulted in investors' losses, their conduct affected all investors, not just Hollenbeck's investors.  Accordingly, any recovery from those defendants should be for the benefit of all investors, not just Hollenbeck's investors.  As noted above, if the

12

Receiver determines that any of these individuals or entities is culpable, he will assert claims against them (regardless of whether the North Carolina Action is stayed). The Receiver's current assessment is that none of the defendants in the North Carolina Action have financial resources sufficient to make all investors whole. Therefore, it would be unfair and inequitable for this Court to allow a group of investors to pursue claims on their own behalf unless and until the Receiver has either: (1) resolved claims against them for the benefit of all investors and obtained the approval of this Court for his final report and plan of distribution; or, (2) determined that any such claims are not worth pursuing. Moreover, if the defendants in the North Carolina Action are required to defend multiple claims alleging essentially the same wrongdoing, their assets are likely to be further depleted by the expense of litigation, leaving less available to satisfy the Receiver's claims.

36.     No harm will be suffered by Hollenbeck's investors if the North Carolina Action is stayed in accordance with the Receiver's request as set forth in this Motion.

37.     With respect to Hollenbeck (and other sales agents), it is possible that individual investors have claims that may not be available to the Receiver. Accordingly, the Receiver does not object to Hollenbeck's investors (or any other investors) pursuing claims against their respective MBA sales agents.

WHEREFORE, the Receiver respectfully requests that this Motion be granted as follows:

(a)     Enjoining Scott B. Hollenbeck, his counsel and the other named plaintiffs from further prosecution of the North Carolina Action until the earlier of: (1) this Court's approval of the Receiver's final report and plan of distribution, which will address how claims against the defendants in the North Carolina were resolved; or, (2) the Receiver's determination that any such claims are not worth pursuing;

(b)     Sanctioning Hollenbeck for his refusal to comply with the Receiver's request by requiring him to reimburse the Receiver Estate for attorneys fees and other expenses incurred in filing and litigating this Motion; and,

(c)     Entering an order setting an evidentiary hearing on this Motion and ordering Scott B. Hollenbeck, his counsel and the other named plaintiffs in the North Carolina Action to show cause why the relief requested in this Motion should not be granted.

Respectfully submitted, this 8th day of February, 2005.

By:    */s/ J. David Dantzler, Jr.*
        J. David Dantzler, Jr.
        Georgia Bar No. 205125
        Attorney for S. Gregory Hays,
        Receiver For Defendants  Mobile
        Billboards of America,     Inc.,
        International Payphone
        Corporation, Reserve Guaranty
        Trust and Tiger Media, Inc.

        Troutman Sanders LLP
        Bank of America Plaza
        Suite 5200
        600 Peachtree Street, N.E.
        Atlanta, Georgia  30308-2216

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>MOBILE BILLBOARDS OF AMERICA, INC., INTERNATIONAL PAYPHONE COMPANY, RESERVE GUARANTY TRUST, MICHAEL A. LOMAS and MICHAEL L. YOUNG,<br><br>    Defendants. | CIVIL ACTION NO.<br><br>1:04-CV-2763-WBH |

## CERTIFICATE OF SERVICE

This shall certify that on February 8, 2005, I electronically filed the

RECEIVER'S MOTION TO SHOW CAUSE AND FOR INJUNCTIVE RELIEF

ENJOINING PROSECUTION OF NORTH CAROLINA CIVIL ACTION with

the Clerk of Court using the CM/EFC system which will automatically send an

e-mail notification of such filing to the following attorneys of record:

James Alexander Rue
William P. Hicks

I certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

>Julie O'Daniel
>Alston & Bird LLP
>One Atlantic Center
>1201 West Peachtree Street
>Atlanta, GA  30309-3424
>
>Nina Marino
>Kaplan Marino, Attorneys at Law
>9454 Wilshire Boulevard, Suite 500
>Beverly Hills, CA  90212
>
>J. Wesley Covington
>Bryant, Patterson, Covington, Idol & Lewis, P.A.
>P.O. Box 341
>Durham, NC  27702
>
>Gregory Bartko
>Law Office of Gregory Bartko
>3475 Lenox Road
>Suite 400
>Atlanta, GA  30326

This 8th day of February, 2005.

By:   */s/ J. David Dantzler, Jr.*
J. David Dantzler, Jr.
Georgia Bar No. 205125
Attorney for S. Gregory Hays,
Receiver
For Defendants Mobile
Billboards of America, Inc.,
International Payphone
Corporation, Reserve Guaranty
Trust and Tiger Media, Inc.

Troutman Sanders LLP
Bank of America Plaza
Suite 5200
600 Peachtree Street, N.E.
Atlanta, Georgia  30308-2216