# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>MOBILE BILLBOARDS OF AMERICA, INC., INTERNATIONAL PAYPHONE CORPORATION, TIGER MEDIA, INC., RESERVE GUARANTY TRUST, CALIFORNIA MOBILE BILLBOARDS, INC., WESTERN RESERVE GUARANTY TRUST, MICHAEL A. LOMAS and MICHAEL L. YOUNG,<br><br>    Defendants. | CIVIL ACTION NO.<br>1:04-CV-2763-WBH |

## <u>RECEIVER'S FINAL REPORT</u>

S. Gregory Hays, Receiver for Defendants Mobile Billboards of America,

Inc. ("MBA"); International Payphone Corporation ("IPC") d/b/a Outdoor Media

Industries ("Outdoor Media"); Tiger Media, Inc. ("Tiger Media"); Reserve

Guaranty Trust ("RGT"); California Mobile Billboards, Inc. ("CMBI"); and

Western Reserve Guaranty Trust ("WGRT") (collectively referred to as the

"Receiver Entities" or the "Receiver Estate"), files this Final Report in accordance

with Section 6.4 of the Receiver's Plan for Claims Administration and Distribution

of Proceeds.

## BACKGROUND

1.      The Receiver was appointed by this Court in an Order entered in this action on September 21, 2004, which was subsequently amended by Orders dated October 18, 2004 and February 7, 2005 (collectively the "Receivership Orders").

2.      Pursuant to the Receivership Orders, this Court authorized and directed the Receiver to: (a) take control of, manage and administer the business operations and assets of Receiver Entities; (b) trace the proceeds of the investment offerings that are the subject of this action; (c) investigate, through formal discovery and otherwise, the facts and circumstances surrounding the subject investment offerings; (d) prosecute and defend claims on behalf of the Receiver Entities; and (e) marshal the assets of the Receiver Entities and distribute them to the investors and creditors who have filed valid claims with the Receiver Estate.

3.      The Receiver has previously filed four interim reports in this Court on December 1, 2004, March 3, 2005, June 15, 2005, and June 19, 2006 providing detailed information regarding this receivership and the subject investment scheme.  (Dkt. #'s 43, 67, 78, and 110.)  These reports are available on the Receiver's website, www.haysconsulting.net.  In general, the facts, circumstances, and findings set forth in those reports are accurate as of the date of the filing of this Final Report.

4.      In sum, the Receiver and the professionals working with him engaged in extensive activities in furtherance of the Receiver's responsibilities.  In particular, their activities included the following:

- Enforcing the "asset freeze" ordered by this Court in the Receivership Orders (for a detailed list of some of the entities and individuals that received notice of the freeze from the Receiver, see the First Interim Report (Dkt. # 43) at 5-6);

- Collecting and reviewing the business records and electronic data of MBA and the other Receiver Entities (for a more in-depth discussion of the information collected and reviewed in this case, see the First Interim Report (Dkt. # 43) at 3-5);

- Obtaining, reviewing, and analyzing records, either by subpoena or agreement, from banks, attorneys, accountants, investors and other third-parties who had business dealings with MBA and/or the other Receiver Entities (for detailed lists of some of the entities and individuals that received subpoenas in this case, see the First Interim Report (Dkt. # 43) at 29-30 and the Third Interim Report (Dkt. # 78) at 5-6, 9);

- Conducting and/or participating in dozens of discovery depositions and/or interviews (for a list of some of the discovery depositions, see the Third Interim Report (Dkt. # 78) at 6);

- Obtaining information from investors and other witnesses through interviews, written claim forms and similar communications;

- Developing and building a financial database that includes approximately 68,000 transactions (i.e., payments, deposits and other movements of money), which has been used to trace the transfers of subject funds (for an in-depth description of the efforts of the Receiver and the professionals working with him, see the Third Interim Report (Dkt. # 78) at 8-12);

- Performing an extensive accounting and funds tracing that involved the analysis of voluminous amounts of material, including bank statements, check copies, cancelled checks, deposit slips, and wire advices regarding at least 105 different bank accounts;

- Performing an exhaustive analysis with regard to the tax returns filed by the Receiver Entities and filing final federal and state tax returns for all of the Receiver Entities, resulting in tax refunds in excess of $65,000;

- Defending and answering claims that had been asserted against Receiver Entities by various individuals and state regulatory entities;

- Filing and prosecuting civil litigation against 143 of the 150 sales agents (the "Sales Agent Litigation"), who collectively were paid over $19 million on the sale of billboard investments, seeking disgorgement of all commissions and bonuses received (*see* Fourth Interim Report (Dkt. # 110) at 12; *supra* p. 9, at ¶ 11);

- Participating in extensive discovery and motions practice in the Sales Agent Litigation, which resulted in summary judgment in favor of the Receiver and against the sales agents regarding all of the legal issues fundamental to the Receiver's claims;

- Entering into settlement agreements with, or obtaining judgments (many by default) against, the sales agent defendants (while a relatively small percentage of the judgments have actually been recovered to date, the litigation did have the effect of causing certain sales agents to return in excess of $1 million to investors to whom they had sold billboards);

- Filing and prosecuting civil litigation against a law firm retained by Defendants, Paul, Hastings, Janofsky & Walker LLP (*see* Fourth Interim Report (Dkt. # 110) at 16-17);

- Negotiating a settlement with Paul Hastings, Janofsky & Walker LLP, for $4.25 million, which netted over $2.8 million for the Receiver Estate after payment of contingent professional fees and related expenses (*see supra* p. 12, at ¶ 14);

- Negotiating a settlement with auditors retained by Defendants, Heiser and Jesko, Inc., which resulted in the recovery of $325,000 (*see* Fourth Interim Report (Dkt. # 110) at 11; *supra* p. 9, at ¶ 10);

- Resolving a claim against the trustee of the Reserve Guaranty Trust, which resulted in recovery to the Receiver Estate of $210,000 (*see supra* p. 12, at ¶ 15; *see also* First Interim Report (Dkt. # 43) at 15-16 for a general description of RGT and its role in the underlying fraud);

- Recovering assets in the possession of third parties, including the recovery of more than $225,000 in retainers held by professional firms and over $70,900 in other assets (*see* Third Interim Report (Dkt. # 78) at 4, 14, Ex. B);

- Collecting delinquent outstanding receivables owed to the Defendants in the amount of $118,109 at the date of the Receiver's appointment (*see* Third Interim Report (Dkt. # 78) at 4);

- Securing a contract for sale of the warehoused billboard frame inventory at a price of $126,300, which greatly exceeded the nominal scrap metal price previously offered (*see* Fourth Interim Report (Dkt. # 110) at 7-8 for an explanation of the Receiver's efforts to secure this sale);

- Taking possession of remaining memorabilia purchased by the Defendant entities to benefit Michael Lomas, the sale of which generated a net recovery of $26,500;

- Performing tasks related to the sale of Defendant Lomas' penthouse condominium located in Long Beach, California, and filing civil litigation to resolve pre-receivership judgment issues affecting clear title to the property, which resulted in a net recovery to the Receiver Estate of $216,870 (*see* Third Interim Report (Dkt. # 78) at 15-16; Fourth Interim Report (Dkt. # 110) at 9-10);

- Restructuring, managing, and selling the IPC payphone operation, which realized over $1.3 million in profits for the Receiver Estate through March 31, 2008 (net of all fees and expenses);

- Responding to a subpoena from the Texas State Securities Board and preparing to testify in a criminal proceeding in Texas against a sales agent;

- Responding to a subpoena and multiple subsequent requests for information from the United States Attorney for the Eastern District of North Carolina and defense counsel regarding criminal proceedings against MBA's principals and others; and

- Testifying and otherwise participating in the criminal proceedings in the Eastern District of North Carolina. As a result of these efforts, Michael Lomas (MBA's CEO), who pled guilty pursuant to an agreement with the government, was sentenced to 20 years in prison and was immediately taken into custody. Sue Knight (MBA's controller) and Arthur Anderson (MBA's Vice President of Sales), both of whom also pled guilty and received sentences of two and one-half years and five years, respectively, were directed to promptly self-report to assigned facilities. Laurinda Holohan (MBA's secretary) and Scott Hollenbeck (a sales agent) were tried by jury in January 2008 and found guilty on twelve counts of mail fraud. Ms. Holohan was sentenced to slightly more than six years and Scott Hollenbeck, who was responsible for selling over $11 million in investments to 139 people, received a 14 year sentence and was taken into custody immediately following the sentencing hearing. Michael Young (MBA's COO) surrendered to authorities in November 2008, pled guilty, and is currently awaiting sentencing while incarcerated.

### *Accounting and Tracing of the Investment Proceeds*

5.     As indicated in the Receiver's Fourth Interim Report, filed on June 19, 2006, investors paid approximately $73 million into the underlying Ponzi scheme ($55.9 million for billboard investments and $17.4 million for payphone investments). The disbursement and use of these monies has been traced and accounted for as set forth in more detail in Exhibit A to the Fourth Interim Report. This exhibit is attached hereto as Exhibit A. As demonstrated in the analysis, the

unfortunate reality of this case is that the proceeds of the fraudulent schemes were used up or wasted in the course of the offerings, and approximately $870,000 remained by the time the Receiver was appointed.

6.      In addition to squandering all the money raised from investors, the principals of the Receiver Entities left the corporate entities in disarray.  The Receiver therefore faced a monumental task in resurrecting the IPC payphone operation and organizing and marshaling the other Receivership assets so that the investors could realize some return.  Moreover, although numerous third party claims potentially existed, the vast majority of those claims were against individuals and entities that turned out not to have any assets or insurance.

7.      Despite these obstacles, by virtue of the Receiver's resurrection of the IPC payphone business, effective restructuring, operational management and liquidation of the Receivership Assets, together with several successful recoveries from third parties, the Receiver ultimately accumulated over $2.68 million (net of expenses) to be distributed to investors and creditors with approved claims.  The Receiver has already distributed approximately $2,271,355 of this amount to date and, as set forth below, he intends to make a final distribution estimated at $422,584.  The Receiver and the professionals working with him effectively increased the funds that will ultimately be distributed to investors by over 325% when considering the additional $1 million paid by sales agents to investors as a

direct result of the lawsuit brought by the Receiver.  Moreover, without the aggressive pursuit of the legal claims made in the Receivership, it is likely there would be little or no distribution to investors.

### *Liquidations and Recoveries*

8.     IPC Payphone Portfolio. At the time of the Receiver's appointment, the IPC payphone portfolio was managed poorly and the business was not operating at a profitable margin.  The Receiver and the professionals working with him turned the IPC payphone operation around and made significant profits which were used to fund the litigation expenses of the Receiver Estate.  Moreover, the Receiver and those working with him increased the value of the IPC payphone portfolio such that the Receiver was able to successfully sell the portfolio on April 1, 2008 for a significant, but confidential, return, which is included in the calculation of net profits disclosed above.

9.     Billboard Frame Inventory.  At the outset of this Receivership, the Receiver acquired unfinished billboard parts, which included several hundred thousand linear feet of extruded aluminum.  The market for these materials was very limited.  Despite the limited market, the Receiver located an interested party who purchased this inventory for $126,300.  In addition to the purchase price, the purchaser assumed the warehouse rental obligation that totaled $600 per month. This sale was accomplished as the result of significant effort by the Receiver's

staff, and resulted in the recovery of a price substantially higher than the amount that would have resulted from a sale of the materials to a scrap dealer.

10.    Settlement with Auditors.  Heiser and Jesko, Inc., a small accounting firm located in Ohio ("H&J"), performed audits for Mobile Billboards and CMBI. The Receiver and the professionals working with him reviewed these audits as a part of their investigation, determined that the Receiver had viable claims against H&J, and made a demand based on those claims.  Without having to commence formal litigation, the Receiver and H&J were able to agree to a settlement, which resulted in the recovery of $325,000 to the Receiver Estate.

11.    Sales Agents Litigation.  As summarized above and more fully described in the First Interim Report, the subject billboard investments were sold through a network of sales agents.  The cumulative amount paid to these sales agents in commissions and bonuses exceeded $19 million.  The Receiver and his counsel made efforts to recover these commissions by sending letters to 150 different sales agents demanding a return of commissions.  Only a few of the agents returned their commissions in response to these demand letters.  Therefore, on or about October 18, 2005, the Receiver filed a lawsuit against 143 sales agents for the return of all commissions and/or bonuses received as a result of their sales activities.  *See S. Gregory Hays, Receiver for Mobile Billboards of America, Inc., et al. v. David E. Adam, et al.*, Civil Action File No. 1:05-CV-2705 - CAP.  The

Receiver's counsel committed time and money to tasks in this litigation based upon a "cost/benefit" analysis, were consistently mindful of the fact that they were being paid from funds that were assets of the Receivership Estate, and kept fees to a minimum. The Receiver and his counsel were confident that the merits of the claims against the sales agents were strong, which was confirmed by the Court's order entered on March 15, 2007, finding all sales agents liable to the Receiver as a matter of law for all of the commissions and bonuses they received. *See Hays v. Adams*, 512 F. Supp. 2d 1330 (N.D. Ga. 2007). On the heels of this Order, the Receiver procured approximately $3.1 million in judgments against over 40 of the sales agent defendants. Additionally, the Receiver, through his action in this lawsuit against the sales agents, was able to compel and verify that over $1 million was paid back to investors by various individual sales agent defendants.[1] Despite the strength of the Receiver's legal position, however, the vast majority of the sales agents had very limited resources for satisfaction of the judgments, or even to make an offer of settlement. Additionally, numerous sales agent defendants initiated bankruptcy proceedings, which stayed the lawsuit as to them. The various bankruptcy proceedings revealed that the sales agent defendants had little to no

---

[1] Moreover, based in part on the information and records gathered in by the Receiver in his investigation of this matter, approximately 93 of the aggrieved investors were able to bring separate claims against various registered brokers and dealers and recover over $1.9 million.

assets to pay creditors, including the Receiver, and did not result in the recovery of any funds for the Receiver Estate. Accordingly, although the Court found the sales agents defendants liable, and despite the fact that the Receiver procured a substantial amount in judgments against the sales agent defendants, the Receiver has not recovered any significant amount of cash from the sales agent defendants, and the agents appear for the most part to be judgment proof. Thus, minimal, if any, recovery is expected.

12. Paul, Hastings, Janofsky & Walker, LLP Litigation. On March 31, 2006, the Receiver and six individual investors filed a complaint against the law firm of Paul, Hastings, Janofsky & Walker, LLP ("Paul Hastings"). *Hays, et. al. v. Paul, Hastings, Janofsky & Walker LLP*, Civil Action File No. 1:06-CV-0754-CAP, in the United States District Court for the Northern District of Georgia. The Receiver's attorneys represented all plaintiffs in that case on a contingency basis. The lawsuit resulted in a favorable settlement for the Receiver for $4.25 million, which netted a recovery of $2.83 million for the Receiver Estate.

13. Settlement with TCA Trust Corp. America. TCA Trust Corp. America ("TCA") acted as Property Trustee for the RGT, the trust that was established by the principals of MBA purportedly to assure investors that money would be available to fund MBA's repurchase obligations to investors. The Receiver and the professionals working with him determined that the Receiver had

viable claims against TCA and made a demand based on those claims. Without resorting to formal litigation, the Receiver and TCA were able to agree to a settlement, which resulted in the recovery of $210,000 for the Receiver Estate.

### *Treatment of the Payphone Portfolio in the Receiver Estate*

14.    Payphone Investments.    As explained in the Second, Third and Fourth Interim Reports, the portfolio of payphones was an active business operation that the Receiver inherited at his appointment and resurrected over the life of the Receivership. At the time of his appointment, questions existed as to the ownership of particular individual payphones that were allegedly "assigned" to a discrete number of investors. (*See* Second Interim Report (Dkt. # 67) at 4.) For the reasons explained below, the Receiver treated all payphones as part of a common pool of Receivership Assets and did not recognize any claims to any particular payphone in the Receivership Estate.

Prior to the MBA investment scheme, from March 2000 until approximately November 2001, Defendants Lomas, Young and others developed, promoted and sold similar sale and lease back investments in pay telephones using a corporation known as National Payphone Company ("NPC") that raised over $17 million. IPC leased the payphones from NPC's investors and was responsible for their management and operation.

Payphone investors were led to believe that payphone revenues were generated by coin deposits into the payphones and by "dial around" revenue. Coin deposits were collected by service technicians and turned over to IPC for deposit. "Dial around" revenues came from the long distance carriers or other service providers when calls were made at the payphones using credit cards or prepaid calling cards. Although the payphones made some money, the funds generated from the payphones were not sufficient to make the lease payments to the investors. Instead, new investors' purchase monies were used to make the promised payments to earlier investors. Moreover, payphones were not installed and operating for each investor who paid money to purchase one.

There were 2,199 payphones operating at the time of the Receiver's appointment. Some of these payphones were purported to be assigned to individual investors. The records regarding actual ownership of certain payphones are incomplete and sometimes conflicting. Of the 2,199 operating payphones, it appears that 355 of them purportedly were "assigned" to particular investors. The other 1,844 were either never assigned to investors, never owned by the Defendants, or had been shut down and permanently removed from their indicated locations. Many of the payphones appear to have been installed and operating at the time they were sold to investors; however, the Receiver has identified instances of apparently non-existent payphones being sold and assigned to investors, other

instances of the same payphones being sold to multiple investors, and instances where operating payphones were removed within less than a year of being sold to investors. To the extent that payphones existed at the time of the sales, and to the extent they purportedly were assigned, the assignments were random without regard to the location or profitability of any single telephone.

This "assignment" of a portion of the actual payphones was illusory in that revenue generated from the individual "assigned" payphones was not consistently paid to those investors, if ever. Instead, those revenues were commingled into the same accounts as the monies raised from the unassigned payphones. There was no segregation by investor of the monies generated by the "assigned" phones. In fact, the revenue generated from the payphones was pooled together with the money from the billboards investors. Payments to investors, if any, were made from that pool. In sum, there is no evidence to suggest that any particular NPC investor to whom a payphone was "assigned" was treated differently from other NPC investors or that they ever received the actual revenue generated by the particular payphone purportedly assigned to them. There is no evidence to suggest that any NPC investor was treated differently from MBA investors. As such, there was no meaningful difference between the NPC investors to whom payphones were assigned, other NPC investors, and MBA investors.

- 14 -

15.    The Consolidation of the Assets and Liabilities of MBA and IPC. NPC and IPC changed the focus of their sales from payphones to the mobile billboard investments in or about November 2001.  MBA was formed for this purpose, and NPC was merged into MBA on or about November 1, 2001.  While it is evident that the intent of the individuals who were behind the Ponzi scheme was to contribute the payphones to RGT at the time NPC merged into MBA, most of the payphones, if not all, continued to be operated and maintained in the name of IPC.  The funds raised by both the billboard and payphone scheme were commingled in the same accounts, were used interchangeably, and were transferred to IPC, d/b/a Outdoor Media to make the "monthly lease" (Ponzi) payments to the previous investors.

At the time of the shift in focus from payphones to billboards, existing payphone investors were given the option to exchange their payphone investments for billboard investments.  Only a limited number of payphone investors declined to accept the exchange offer and continued to receive payments pursuant to the terms of payphone leases.

None of the investors to whom a specific payphone was "assigned" and who declined to exchange their payphone investment for mobile billboards ever assumed responsibility for the management or operation of "their" payphones. That responsibility remained with IPC.  Moreover, it would have been logistically

impossible for individual investors to manage and operate the payphones themselves. If the payphone existed and was installed and operating, it was frequently located thousands of miles from the residence of the investor, most often subject to a site lease with a property owner, and likely was one of a group of phones that was the subject of a master site lease involving multiple locations. Additionally, licensing and servicing requirements were such that it was not feasible for an individual to undertake this activity. There also were complicated issues involving "dial around" revenue collection and the payment of "master telephone bills" that covered a large number of phones, which made independent management of individual phones practically impossible.

For this reason, when the Receiver took over the management of the IPC payphone portfolio at the time of his appointment, to the extent any "assigned" payphones were in the portfolio (which was impossible to determine given the poor records kept by NPC, RGT, and IPC), the Receiver continued IPC's practice of disregarding those purported "assignments" and treating each of the payphones as a common asset.

Based on his extensive investigation in this case, the Receiver concluded that, at all times relevant hereto, NPC, RGT, MBA, and IPC were operated as a common enterprise by the same individuals and the assets and liabilities of NPC and MBA were commingled and consolidated. Accordingly, for purposes of

managing the payphone portfolio and making distributions to claimants under the Plan of Distribution, the assets marshaled by the Receiver have consistently been consolidated into one common pool. Further, to the extent there were purported assignments of actual payphones to a limited number of NPC investors, the Receiver determined that these assignments should be disregarded because: (1) such "assignments" were illusory in that they frequently did not involve an actual payphone and never resulted in any meaningful difference for any NPC investor, thereby rendering it inequitable to recognize any assignment, (2) the "assignments" were not documented in a manner that would permit the Receiver to discover which investors (if any) were assigned which phones, and (3) practical considerations related to the management and sale of the payphones made recognition of particular payphone assignments impossible. Accordingly, the Receiver treated the IPC payphones just as every other receivership asset and did not recognize any claims to any particular payphone in the Receivership Estate.

## SUMMARY OF CLAIMS ADMINISTRATION AND DISTRIBUTION PROCESS

16.    After collecting and marshalling the assets of the Receiver Estate, as discussed above, the Receiver proceeded to distribute the assets to investors and creditors with valid claims. In accordance with his responsibilities under the Receivership Orders, the Receiver developed a claims submission and review process designed to: identify investors and creditors with claims against the

- 17 -

Receiver Estate; determine the proper amounts of those claims; and, ultimately, make payments to legitimate claimants in a way that is appropriate under the circumstances of this case.  The process developed by the Receiver to accomplish these purposes is set forth in the Receiver's Plan for Claims Administration and Distribution of Proceeds (the "Plan"), which was approved by the Court on October 16, 2008 (Dkt. # 127).

17.    After carefully administering the claims submission and review process pursuant to the Plan, the Receiver presented a Schedule of Claims and Distribution of Proceeds (the "Schedule") to the Court on December 3, 2008 (Dkt. # 131), and the Court issued an Order approving the Schedule on January 12, 2009 (Dkt. # 133).  The Schedule sets forth the approved amounts of all investor and creditor claims in this case.

18.    As described below, the Receiver has now distributed the vast majority of the Receiver Estate to investors and creditors with approved claims. Although the Receiver reserves the right to pursue additional recoveries from third parties in his sole discretion, the Receiver does not believe that any such recoveries are likely.[2]  Accordingly, it is now appropriate to close the receivership.

---

[2] If any funds are recovered after the receivership is closed, the Receiver will provide the Court with a proposal for the distribution of such funds.  As set forth in the attached proposed Order, the Court will retain jurisdiction over all matters relating to the receivership, including the distribution of funds recovered after the receivership has been closed.

19. Pursuant to Section 6.4 of the Plan, this Final Report contains a financial summary indicating the receipt and disbursement of money by the Receiver during the course of the receivership, a description of the activities necessary to close the receivership, and a plan for the distribution of all funds remaining in the Receiver Estate.

**FINANCIAL SUMMARY FOR THE RECEIVER ESTATE**

20. Over the course of this receivership, the Receiver recovered from various sources approximately $8.2 million to be administered in the Receiver Estate and ultimately distributed to investors and creditors with approved claims. As set forth in the Plan, the Receiver administered these funds as a common fund, with all investors and unsecured creditors receiving a pro rata payment of the monies available for distribution.

21. To date, the Receiver has distributed $2,271,355 to investors and creditors with approved claims. The total amount of all approved claims in this case is $45,426,426.64.[3] Accordingly, each investor and creditor with an approved claim has received approximately 5% of his or her approved claim in distributions from the Estate.

---

[3] This amount includes the allowed claim of one investor whose claim paperwork was misrouted by the U.S. Postal Service, and who was therefore not included in prior distributions from the Receiver Estate. The investor will be included in the final distribution referenced herein in an amount sufficient to bring her current with the distributions to other investors.

22.    Approximately $5.5 million of the Receiver Estate has been used to pay the fees and expenses incurred in connection with administering the Receiver Estate, including fees incurred by the Receiver and the professionals hired by the Receiver to assist him in performing his duties.  This total amount includes the payment of approximately $1.42 million to cover the contingency fee and expenses necessary to obtain the $4.25 million settlement with Paul Hastings discussed in Paragraph 14, which ultimately netted a recovery of $2.83 million for the Receiver Estate.  As summarized above, the activities which generated all fees and expenses paid out of the Receiver Estate were reasonable and necessary in order to generate the amount of funds that was ultimately distributed to investors.[4]  Without incurring such fees and expenses, like the contingency fee that was necessary to net $2.83 million for the Receiver Estate, there likely would not have been enough funds available to make any distribution to investors and creditors.  All of the fees and expenses paid from the Receiver to date have been approved by the Court.

23.    The Receiver has retained $499,702 in the Receiver Estate, including $50,000 that is expected to be received from the California Unclaimed Property Division this month.  The Receiver's proposal for the distribution of this amount is set forth below.

---

[4] The activities are discussed in detail in the Receiver's various Motions for Authority to Pay Professional Fees and to Reimburse Costs filed with the Court. (Dkt. #'s 79, 111, 113, 121, 123, 130, and 138.)

24.     As required by Section 6.4 of the Plan, a financial statement for the Receiver Estate indicating the receipt and disbursement of money by the Receiver during the course of the receivership is attached as Exhibit B.

## ACTIVITIES NECESSARY TO CLOSE THE RECEIVERSHIP AND USE OF FUNDS REMAINING IN THE RECEIVER ESTATE

25.     <u>Final Tax Returns</u>.  The Receiver has filed all necessary and appropriate tax returns for the Receiver Estate and has paid the tax liability owed by the Estate.  By its Order dated October 16, 2008, the Court established December 15, 2008, as the deadline for the filing of claims with the Receiver for any tax liability owed by the Receiver Estate.  (Dkt. # 127.)  The Receiver provided the Internal Revenue Service and other appropriate taxing authorities with notice of that deadline.  Accordingly, the Receiver does not anticipate any additional taxes being assessed for the Receiver Estate.

26.     <u>Final Distribution</u>.  As soon as reasonably practicable, the Receiver will make a final distribution to investors and creditors with approved claims in the estimated total amount of $422,584.[5]  Pending approval of the attached proposed Order, the Receiver expects this distribution to take place within 60 days. Investors and creditors with approved claims will receive a pro rata portion of this distribution in accordance with the amount of their claims as listed on the

---

[5] This amount includes a distribution of $4,876 to the investor referenced in footnote 3.

Schedule.  This distribution will account for approximately .93% of all approved claims in this case, so that after the distribution each investor and creditor will have a received a total of 5.93% of his or her approved claim in distributions over the course of this receivership.

27.   Document Storage.  The Receiver will continue to store the records gathered during the course of the receivership and any other appropriate documents for a period of approximately two (2) years from the date of this filing.  After two (2) years, the Receiver intends to destroy the records as appropriate, in his discretion, unless he is ordered by a Court of competent jurisdiction to retain such records for a longer period.

28.   Final Payment of Professional Fees and Expenses.  The Receiver has carefully estimated the amount of professional fees and expenses that will be necessary to close the receivership, and has calculated the amount of the final distribution to maximize the distribution to investors while reserving precisely enough funds to cover accrued and estimated fees and expenses.  As of the date of this filing, the Receiver and the professionals working with him have incurred total unpaid fees and expenses of approximately $41,761.80 covering work performed

from May 1 through November 30, 2009.  These fees and expenses are set forth in the various monthly statements attached hereto as Exhibit C through E.[6]

29.     In addition to these previously accrued expenses, the Receiver estimates that additional fees and expenses will be incurred in connection with the activities discussed herein that are necessary to close this receivership in the total amount of $35,355.77.  A budget setting forth the basis for these estimated fees and expenses is attached as Exhibit F.

30.     The total accrued and estimated professional fees and expenses necessary to close this receivership are therefore $77,117.57.  The Receiver hereby requests that this Court authorize the payment of $77,117.57 from the Receiver Estate to cover all such accrued and estimated fees and expenses.  As with the fees and expenses that were the subject of the Receiver's First through Sixth Motions for Authority to Pay Professional Fees and to Reimburse Costs filed with the Court.  (Dkt. #'s 79, 111, 113, 121, 123, 130, and 138), payment of these fees and expenses is justified under the circumstances of this case.  Because the

---

[6] The attached copies have been redacted to remove privileged and confidential information.  In submitting these detailed statements, the Receiver does not intend to and should not be construed to waive, limit or otherwise modify any rights that he may have with respect to the attorney-client privilege, the attorney work product doctrine or any other applicable privilege.  Complete "non-redacted" versions of the attached exhibits will be provided upon request to only the Court.

circumstances justifying the fees, expenses, and professional rates at issue are discussed at length in the prior motions, they will not be restated here.

31.     Payment of the fees and expenses at this juncture is appropriate and necessary to effect the full distribution of the Receiver Estate.  After payment of the $77,117.57 and the final distribution to investors and creditors, there will be no funds remaining in the Estate and the receivership may be closed.

32.     The Receiver recognizes that payment of the fees and expenses at this point necessarily requires the approval of estimated fees and expenses which could prove to ultimately be incorrect, despite the Receiver's best efforts to estimate them precisely.  While this could result in the Receiver Team being overpaid for the work performed, it could also result in the Receiver Team being underpaid by incurring unforeseen fees and expenses that are not covered by the amount of the payment.  In fact, the risk that the Receiver Team will be underpaid for work performed is potentially much higher than the risk of overpayment, as there is no limit to the amount of unforeseen fees and expenses which could arise after the date of this filing.  On the other hand, the potential overpayment, if any, would be relatively minimal; only $35,355.77 of the total $77,117.57 is attributable to estimated fees and expenses, so the *most* the Receiver Team could be overpaid would be $35,355.77, and that would only happen if the Receiver Team incurred

no fees or expenses at all – which is impossible given the amount of work remaining to close the receivership.

33.    Despite these risks, the Receiver believes that paying accrued and estimated fees and expenses at this point is ultimately in the best interest of the investors and the Receiver Estate.  Payment will enable the Receiver to immediately distribute the entirety of the Receiver Estate, which is necessary to fully close the receivership.  The alternative of waiting to file additional fee applications after all of the activities discussed herein have been finalized (including document retention, which will take two years), would unnecessarily delay the receivership's closure with no real benefit to the investors since the potential amount remaining in the Estate at that time, if any, would likely be so nominal that it would not justify another distribution to investors.

34.    Donation of Unclaimed Funds.  If any distribution check issued to an investor in this case has not been cashed after a period of 120 days from the date of the check, the unclaimed funds associated with that check will be used to pay any outstanding fees and expenses that have not been satisfied by the payment requested in Paragraph 32 above.  If there are any unclaimed funds remaining after all fees and expenses have been paid, the remaining unclaimed funds will be donated to the United States Treasury Department.

35.   <u>Final Notice</u>.  After the final distribution to investors and the final payment of professional fees and expenses have been made, the Receiver shall file a simple Notice with the Court advising that all funds have been distributed from the Receiver Estate and that the receivership will be closed.  Upon filing of the Notice, the receivership will be closed without the necessity of further Order of the Court and the Receiver shall be relieved of all of his duties and obligations under the Receivership Orders.

36.   A proposed Order authorizing the procedure set forth herein and the closing of the receivership is attached hereto.

Respectfully submitted this 7th day of December, 2009.

/s/ Charles R. Burnett
J. David Dantzler
Georgia Bar No. 205125
david.dantzler@troutmansanders.com
Charles R. Burnett
Georgia Bar No. 396397
charles.burnett@troutmansanders.com

TROUTMAN SANDERS LLP
Bank of America Plaza, Suite 5200
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
(404) 885-3000 (voice)
(404) 885-3900 (facsimile)

Counsel for S. Gregory Hays,
Receiver For Defendants Mobile Billboards of America, Inc., International Payphone Corporation, Reserve Guaranty Trust and Tiger Media, Inc.

## **Certification of Counsel**

I hereby certify that this document is submitted in Times New Roman 14

point type as required by N.D. Ga. Local Rule 5.1(b).


        */s/ Charles R. Burnett*

        Charles R. Burnett

        Georgia Bar No. 396397

        charles.burnett@troutmansanders.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> MOBILE BILLBOARDS OF AMERICA, INC., INTERNATIONAL PAYPHONE COMPANY, TIGER MEDIA, INC., RESERVE GUARANTY TRUST, MICHAEL A. LOMAS and MICHAEL L. YOUNG, <br><br> Defendants. | CIVIL ACTION NO. <br><br> 1:04-CV-2763-WBH |

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 7, 2009, I electronically filed the accompanying

RECEIVER'S FINAL REPORT with the Clerk of Court using the CM/EFC

system, which will automatically send an e-mail notification of such filing to the

following attorneys of record:

James Alexander Rue, Esq.
William P. Hicks, Esq.
Julie M. O'Daniel, Esq.
Nina Marino, Esq.

- 29 -

I further certify that on December 7, 2009, the foregoing was served on the

Internal Revenue Service by depositing a copy in the United States Mail with

adequate postage thereon and addressed as follows:

> Department of the Treasury
> Internal Revenue Service Center
> Cincinnati, OH 45999-0012

> */s/ Charles R. Burnett*
> Georgia Bar No. 396397
> charles.burnett@troutmansanders.com